# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Case No. 309-09548 |
| **OLD TIME POTTERY, INC.,** ) | Chapter 11 |
| ) | Judge Lundin |
| Debtor. ) | |

## AFFIDAVIT OF ROBERT L. SHARP IN SUPPORT OF FIRST DAY MOTIONS

STATE OF TENNESSEE )
                              )
COUNTY OF RUTHERFORD )

Robert L. Sharp, having been duly sworn, states as follows:

1. I am, and at all times relevant hereto was, over eighteen (18) years of age. I am the Chief Financial Officer of Old Time Pottery, Inc. ("OTP" or the "Debtor"). In that capacity, I have intimate knowledge of the day-to-day operations and Debtor's financial affairs.

2 Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, my review of the relevant documents, or my opinion, based upon my experience and knowledge of Debtor's operations and financial conditions. If I were called to testify, I could and would testify competently to the facts set forth herein. I am authorized by Debtor to submit this Affidavit and make the statements herein. This Affidavit is given in support of the following Motions (the "First Day Motions"), which were filed concurrently herewith in the above-referenced Chapter 11 case on August 21, 2009 (the "Petition Date"):

    A. Expedited Motion for Extension of Time to File Statements and Schedules (the "Statements and Schedules Motion");

    B. Expedited Motion for Permission to Maintain and Use Existing Bank Accounts, Cash Management System and Business Forms (the "Bank Accounts Motion");

    C. Expedited Motion for Permission to Pay Prepetition Compensation, Employee Reimbursements and Withholding Taxes (the "Prepetition Compensation Motion");

382438.2/2009490

D. Expedited Motion Pursuant to 11 U.S.C. §§ 105(a), 366(a) and 507 (I) for Authority to Pay Prepetition Utility Claims, (II) to Determine Adequacy of Assurance of Payment for Future Service from Utilities and (III) to Establish Procedures for Determining Requests for Additional Assurance (the "Utilities Motion"); and

E. Expedited Motion for Interim Agreed Order Authorizing Use of Cash Collateral, Granting Replacement Liens and Providing Adequate Protection, and Giving Notice of Final Hearing (the "Cash Collateral Motion").

## I. BACKGROUND INFORMATION

3. On the Petition Date, Debtor filed a voluntary petition in this Court under Title 11, Chapter 11, United States Code (the "Bankruptcy Code"). Pursuant to 11 U.S.C. §§ 1107 and 1108, Debtor continues, and remains, in possession of its properties as Debtor-in-Possession, and is continuing to operate its business and manage its properties as such. No Trustee has been appointed in the above-captioned case (the "Chapter 11 Case"). No official creditors' committee has been formed.

4. The Debtor is generally in the business of operating home décor retail stores. Debtor was founded in 1985 as a single store in Murfreesboro, Tennessee. Presently, Debtor operates 37 stores in twelve states throughout the southeast and midwest United States. Debtor employs approximately 1,600 employees. Debtor owns and operates 37 stores. Debtor owns an additional store that is temporarily closed due to a fire.

## II. STATEMENTS IN SUPPORT OF EXPEDITED MOTION FOR EXTENSION OF TIME TO FILE STATEMENTS AND SCHEDULES

5. OTP has a few employees who are capable of participating and assisting in the preparation of Schedules and Statements. These employees have been, and will continue to be, very busy performing many kinds of necessary work related to this case. At the same time, these employees will have to continue the business of managing the day-to-day operations of Debtor's ordinary business affairs, including overseeing operation of its 37 stores.

6. The volume of work required of these employees in the immediate future justifies OTP's request for an extension of time to file its Schedules and Statements.

7. Additionally, the granting of an extension will aid Debtor in filing Schedules and Statements that are as complete and accurate as possible, thereby benefiting all parties in interest, allowing them to receive notice as soon as possible, and minimizing the need for amendments.

8. Even though Debtor has already begun the extensive process of gathering the necessary information to prepare and finalize the Schedules and Statements, the process is far from complete.

9. Debtor filed with the Chapter 11 petition a list containing the names and addresses of its 20 largest unsecured creditors. Debtor also has lists of the secured creditors and of landlords of the stores. Debtor has also filed a complete creditor mailing matrix. Through the use of these lists, Debtor has been and will continue to provide appropriate notice of its early pleadings.

10. In my opinion, on behalf of Debtor, an extension of time to file Debtor's Schedules and Statements is justified and necessary. Debtor expects that it will be able to complete and file its Schedules and Statements within 25-30 days after the Petition Date.

# III. STATEMENTS IN SUPPORT OF EXPEDITED MOTION FOR PERMISSION TO MAINTAIN AND USE EXISTING BANK ACCOUNTS, CASH MANAGEMENT SYSTEM AND BUSINESS FORMS

11. As of the Petition Date, Debtor maintained the following bank accounts:

   A. A local depository account for each store, several of which are with local SunTrust Banks.

   B. A central "master" operating account with SunTrust Bank, into which the deposits into the depository accounts are swept regularly.

   C. Two payroll accounts with SunTrust Bank, into which amounts are transferred from the "master" operating account to cover payroll-related expenses. Heretofore, these transfers have been made electronically, but henceforth they will be made manually.

   D. An accounts payable account with SunTrust Bank, into which amounts are transferred to cover other disbursements.

   E. A credit card account with SunTrust Bank, into which proceeds of credit card purchases at Debtors' stores are deposited and transferred into the "master" account via its credit card processor, Fifth Third Processing Solutions.

   F. A checking account with Regions Bank.

12. Debtor's cash sales are deposited into accounts with local banks. Those accounts are swept regularly into Debtor's master account. When Debtor's customers pay for their purchases by credit card, those credit card payments are processed by Debtor's credit card processor, Fifth Third Processing Solutions, and the proceeds are deposited into Debtor's credit card account and thence transferred into the master account.

13. Debtor uses its accounts payable account to pay its ordinary trade vendors, its landlords, and its equipment leases, and funds the account on an as-needed basis by direct transfer from its master account. Debtor uses its two payroll accounts to make all payroll-related

382438.2/2009490

4

disbursements, including payroll taxes. All other disbursements, including debt service, are paid from Debtor's master account.

14. Debtor's primary banking relationship is currently with SunTrust Bank. SunTrust has asked that Debtor close its accounts. Debtor intends to do so in the near future, and will open accounts with other banks.

15. It is my opinion, on behalf of Debtor:

A. That Debtor should be allowed to use its pre-existing bank accounts as described above, and not be required to close each prepetition bank account as of the Petition Date or open new postpetition bank accounts with checks imprinted with "Debtor-in-Possession."

B. That compliance with such requirements would unnecessarily disrupt the Debtor's business, impair Debtor's efforts to stabilize operations at a critical stage of this case, and would not confer any benefit on those dealing with Debtor.

C. That maintaining the existing accounts is vital to Debtor because a large portion of the funds it receives and disburses are transferred electronically. The immediate closing of existing accounts and opening of new accounts would cause confusion and disruption, and materially slow the receipt and disbursement of funds at this critical time in Debtor's life. Further, a substantial amount of Debtor's revenues derive from credit card sales; to disrupt the cash management system would severely disturb the flow of these credit card funds.

D. That it is in the interests of creditors and parties in interest to preserve business continuity and avoid the disruption and delay to Debtor's business activities that would necessarily result from immediately closing the accounts and opening new accounts.

E. That Debtor should also be allowed to use its respective correspondence and business forms, such as purchase orders, checks, letterhead, envelopes, insurance and

reimbursement forms, substantially in the forms existing immediately prior to the Petition Date, without reference to its status as Debtor-in-Possession. Debtor and the parties with which it regularly deals depend on the uniformity of these forms to conduct their transactions with maximum efficiency. Substantial time and expense would be required to print new business forms. Use of new forms could slow Debtor's everyday transactions with parties accustomed to debtors' current forms.

   F. That if Debtor needs to purchase new business forms during this Chapter 11 Case, such forms should not be required to include a legend referring to Debtor as Debtor-in-Possession.

   G. That continuation of its prepetition accounts, cash management system and business forms will not negatively affect the rights of any creditors or parties in interest.

   H. The granting of this request and the Motion will not affect the reports and information that Debtor is required to provide, or otherwise affect its conduct as a Debtor-in-Possession.

   I. That, if Debtor is not permitted to maintain and utilize its existing accounts, cash management system and business forms, prejudice will result, including (A) disruption in Debtor's ordinary financial affairs and business operations, diverting them from its duties as Debtor-in-Possession; (B) delay in the administration of Debtor's estate; and (C) cost to the estate to set up new cash and deposit systems, open new accounts, print new business forms, and print new checks.

   16. Debtor will open new accounts in the near future with other institutions and close its SunTrust accounts, in the ordinary course of business and in a manner that does not disrupt its operations and financial procedures, and unduly burden its employees, who are fully occupied with their duties relating to this Chapter 11 Case. In my opinion, such new postpetition accounts

382438.2/2009490

6

should not be required to make reference to Debtor's Chapter 11 case or Debtor's status as a Debtor-in-Possession, in order to maintain continuity in Debtor's dealings with its vendors and customers and for the reasons set forth above.

### IV. STATEMENTS IN SUPPORT OF EXPEDITED MOTION FOR PERMISSION TO PAY PREPETITION COMPENSATION, EMPLOYEE REIMBURSEMENTS AND WITHHOLDING TAXES

17. At its 37 stores, Debtor employs approximately 1,600 employees. Of this total, approximately 59 employees are classified as "corporate" employees. Approximately 31 of these are salaried and 28 are paid hourly. The corporate employees include approximately 54 persons employed in Debtor's Murfreesboro, Tennessee headquarters, plus five district managers. Most of the remaining employees are hourly employees, except for individual store managers and assistant managers, who are salaried employees.

18. As of the August 7, 2009 payroll, for the two-week pay period ending July 31, 2009, the total net payment to approximately one-half of Debtor's hourly employees, including direct deposits, was approximately $312,000.00, or approximately $436.00 per employee per pay period. The total amount paid for salaried employees (for one-half of the managers and assistant mangers, and all of the salaried corporate employees) for the same period was approximately $167,000.00 or approximately $1,965.00 per employee per pay period. In addition to the amounts paid above as of the August 7, 2009 payroll, the Debtor paid employment taxes totaling approximately $136,000.00.

19. The Debtor pays its employees every two (2) weeks. For all OTP employees, the payroll pay period begins on a Saturday and ends fourteen (14) days later, on a Friday. Payroll data is transferred from the stores to corporate headquarters, and checks are disbursed to employees approximately one (1) week after the pay period ends. Thus, employees are paid one (1) week following the end of their pay period. Approximately one-half of all employees are

paid on any given Friday, and the remaining employees are paid the following Friday. By way of example, the pay-period for the two-week period commencing August 1, 2009 ended on August 14, 2009, and those employees will be paid for that pay period on August 21, 2009. The pay-period for the two-week period beginning August 8, 2009 will end August 22, 2009, and those employees will be paid on August 29, 2009. Of course, Debtors withhold and pay required federal income withholding taxes from employees' compensation.

20. Generally, all full-time employees, salaried or hourly, who have been with the Debtor at least six months, are eligible for group health insurance. There are two insurance plans, one for salaried employees and one for hourly employees. The Debtor contributes approximately $65,000 per month for salaried employees, or approximately $550 per enrolled employee. The Debtor contributes approximately $35,000 per month for hourly employees, or approximately $185 per enrolled employee.

21. Debtor generally makes bonuses available to its 38 salaried store managers (a small portion of which will be prepetition) in the amount of approximately $9,000.00 per month, or approximately $237.00 per salaried manager.

22. Employees are also entitled to reimbursement of any expenses paid, though such amount ordinarily is nominal.

23. The compensation of certain employees is subject to garnishments that have been validly issued by various Courts and served upon the Debtors before the commencement of the captioned case.

24. The next regularly scheduled payday is Friday, August 28, 2009, at which time approximately one-half of OTP's employees are to be paid compensation earned from August 8, 2009 through August 21, 2009. The following Friday, September 4, 2009, the other half of OTP's employees are to be paid compensation earned from August 15, 2009 through August 28,

2009. Thus, the Debtor owes prepetition compensation, benefits, taxes and small portions of bonuses to their employees.

25. None of the employees will be paid more than $10,950.00, the maximum amount allowable as a priority claim under 11 U.S.C. § 507(a)(4) and (5), for cumulative prepetition wages, benefits and expenses.

26. OTP pays quarterly unemployment taxes to the States of Tennessee, North Carolina, South Carolina, Georgia, Kentucky, Alabama, Illinois, Florida, Missouri, Ohio, Indiana and Oklahoma, and OTP pays annual federal unemployment taxes. The payments for which the Debtor seeks authority would include amounts for services that were performed prepetition and amounts for customary employment taxes.

27. The employees are essential to the ongoing operations of the Debtor's business and its stores, and are absolutely critical to the success of the Debtor's reorganization efforts. It is my opinion, on behalf of the Debtor, that payment of the above-mentioned employee expenses will not be prejudicial to the creditors, but rather will ensure continued, uninterrupted operations of the Debtor's stores, and will contribute to the value of the estate and ensure the Debtor's success in seeking Chapter 11 relief for the benefit of the creditors of the estate.

## V. STATEMENTS IN SUPPORT OF EXPEDITED MOTION PURSUANT TO 11 U.S.C. §§ 105(A), 366(A) AND 507 (I) FOR AUTHORITY TO PAY PREPETITION UTILITY CLAIMS (II) TO DETERMINE ADEQUACY OF ASSURANCE OF PAYMENT FOR FUTURE SERVICE FROM UTILITIES AND (III) TO ESTABLISH PROCEDURES FOR DETERMINING REQUESTS FOR ADDITIONAL ASSURANCE

28. Before this case was filed, the Debtor contracted for utility services rendered by various utility companies.

29. Utility services are essential to the Debtor's ability to sustain its operations during the Chapter 11 case. An interruption of utility service would severely disrupt the operation of some or all of the Debtor's 38 stores.

30. In the normal conduct of its business, the Debtor uses gas, water, electric, telephone, internet, trash/garbage removal and other services provided by numerous utility companies (the "Utility Companies"). Utility Companies currently used by the Debtor, and notified of this Motion, are listed in Exhibit A to the motion.

31. In the normal course of its operations, the Debtor uses a standard cash management system for payment of the Utility Companies for services used by the Debtor.

32. Debtor timely paid its utility bills prior to the filing of this Case.

33. In my opinion, on behalf of Debtor:

A. Payment for the services rendered by the Utility Companies prepetition, and the administrative expense priority provided pursuant to 11 U.S.C. §§ 503(b) and 507(a)(1), adequately assure payment to Utility Companies for postpetition utility services without the need for deposits or other security. Debtor has, and anticipates that it will continue to have, sufficient funds from operations to make timely payments for all postpetition utility services.

B. An interruption of utility service would severely disrupt the Debtor's business operations. Uninterrupted utility service is vital to the continued operation of the Debtor's business and the safety of its customers, and consequently, to the success of the Chapter 11 case.

C. The Utility Companies will not be prejudiced by the continuation of such service under the terms requested by Debtor, because they will be paid without delay for all amounts they are owed prepetition, and will have adequate assurance that they will be paid all postpetition utility charges as they become due.

# VI. STATEMENTS IN SUPPORT OF EXPEDITED MOTION FOR INTERIM ORDER (1) AUTHORIZING USE OF CASH COLLATERAL, (2) GRANTING REPLACEMENT LIENS AND PROVIDING ADEQUATE PROTECTION, AND (3) GIVING NOTICE OF FINAL HEARING

34. For its 37 stores, the Debtor uses the cash generated from the operations of the stores for various purposes in order to continue the ongoing operations at the stores. The proceeds of sales are used, for example, to purchase inventory and supplies, pay employees and governmental entities, pay rent of both real estate and leased equipment, pay for all types of insurance that Debtor carries, pay utilities, pay for upkeep, security and supplies, pay for management functions, and pay long-term and short-term debt obligations. Debtor is dependent on the use of cash generated from the operations of the stores to keep the stores running smoothly.

35. Debtor's long-term debt obligations are evidenced by certain documents and agreements (the "Loan") in favor of SunTrust Bank ("Lender" or "SunTrust"). As of the Petition Date, the approximate balance owed to SunTrust on the Loan was approximately $18,000,000.00.

36. The Loan is allegedly secured by assets owned by the Debtor at the stores, including the cash generated by operations at the stores. That cash may be the collateral of SunTrust.

37. Debtor wishes to use the cash generated from the operations of its stores. It wishes to provide adequate protection to SunTrust to secure the Lender for any diminution in the value of the Lender's interests in its collateral, in the form of replacement liens.

38. In my opinion, on behalf of Debtors:

A. The use of cash is critical to the everyday, ongoing operations at the Debtor's stores and the operation of the corporation. As noted above, cash is needed to pay

employees and related employment taxes, utilities, insurance, inventory and supplies, upkeep at Debtor's properties, and generally to do all things necessary to keep a corporation and its 37 stores running smoothly without interruption.

B. Without the relief requested herein, the Debtor's operations as a going concern would be compromised, and the stores very shortly would have to be closed.

39. SunTrust asserts first priority security interests in substantially all of the assets of the Debtor, including inventory, equipment, supplies and cash generated from the operations of the stores. It is my opinion, on behalf of the Debtor, that the granting of postpetition replacement liens in the categories of collateral which allegedly secure the Loan, to the same extent SunTrust was secured prepetition, would provide adequate protection for SunTrust's prepetition liens as appropriate under the circumstances. Debtor has submitted with the Motion its proposed budget (the "Budget"), outlining its anticipated cash needs during the first eight (8) weeks of this Case. Debtor wishes to be allowed to spend up to a maximum of 110% of the total amount set forth on the Budget, or such other amounts as may be agreed upon by the Debtor and SunTrust. Without the use of the cash, as demonstrated in the Budget, the Debtor would suffer immediate and irreparable harm, and its efforts at reorganizing herein would be unsuccessful.

Further, Affiant saith not.

_____
Robert L. Sharp

Sworn to and subscribed before me, this the 21 day of August, 2009.

_____
Notary Public
My Commission Expires: 2-2-10

382438.2/200949

12