# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 309-09548 |
| **OLD TIME POTTERY, INC.,** | ) | Chapter 11 |
| | ) | Judge Lundin |
| Debtor. | ) | |

# DISCLOSURE STATEMENT TO ACCOMPANY FIRST AMENDED AND RESTATED CHAPTER 11 PLAN OF REORGANIZATION DATED FEBRUARY 15, 2010 FILED BY DEBTOR

Thomas H. Forrester
G. Rhea Bucy
Gullett, Sanford, Robinson & Martin, PLLC
P.O. Box 198888
Nashville, TN 37219-8888
(615) 244-4994
tforrester@gsrm.com; rbucy@gsrm.com; bke@gsrm.com

Attorneys for Old Time Pottery, Inc.

# TABLE OF CONTENTS

ARTICLE I - INTRODUCTION ................................................................................................. 1

ARTICLE II - HISTORY OF THE DEBTOR AND EVENTS LEADING TO CHAPTER 11 FILING .......................................................................................................................................4

ARTICLE III - PROGRESS OF THE CHAPTER 11 CASE TO DATE ...................................... 8
    A.    Initial Activities ................................................................................................. 8
    B.    Appointment and Activities of Official Committee of Unsecured Creditors ............... 11
    C.    Closure of Certain Stores and Assumption of Leases of Remaining Stores ........... 12
    D.    Orders Setting Bar Dates for Claims ............................................................... 14
    E.    Sales and Margins Since the Petition Date ...................................................... 15

ARTICLE IV - ASSETS OF THE DEBTOR ............................................................................ 16

ARTICLE V - LIABILITIES OF THE DEBTOR ...................................................................... 18
    A.    Secured Claims ............................................................................................... 18
    B.    Priority Claims ................................................................................................ 19
    C.    Administrative Expenses ................................................................................. 19
    D.    General Unsecured Claims .............................................................................. 21

ARTICLE VI - PREPETITION JUDICIAL PROCEEDINGS ................................................... 23

ARTICLE VII - EQUITY INTERESTS ................................................................................... 23

ARTICLE VIII - SUMMARY OF CHAPTER 11 PLAN OF REORGANIZATION ................. 24
    A.    Class 1 ............................................................................................................ 24
    B.    Class 2 ............................................................................................................ 24
    C.    Class 3 ............................................................................................................ 25
    D.    Class 4 ............................................................................................................ 26
    E.    Class 5 ............................................................................................................ 27
    F.    Class 6 ............................................................................................................ 27
    G.    Class 7 ............................................................................................................ 31

ARTICLE IX - IMPLEMENTATION OF THE PLAN ............................................................. 31

ARTICLE X - LIQUIDATION ANALYSIS ............................................................................ 32

ARTICLE XI - ALLOWANCE OF CLAIMS AND TREATMENT OF INTERESTS .............. 35

ARTICLE XII - CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN... 35
    A.    Certain Federal Income Tax Consequences to Debtors Due to the Impairment of Claims, Etc. ................................................................................................... 36
    B.    Certain Federal Income Tax Consequences to Holders of Claims ........................ 37
    C.    Importance of Obtaining Professional Tax Assistance ....................................... 38

ARTICLE XIII - ACCEPTANCE AND CONFIRMATION OF THE PLAN............................ 38
    A.    Acceptance of the Plan ................................................................................... 39
    B.    Confirmation ................................................................................................... 39

ARTICLE XIV - EFFECT OF CONFIRMATION ....................................................... 42
    A.    Injunction ........................................................................................................ 42
    B.    Retention and Enforcement of Claims ............................................................ 42
    C.    Retention of Jurisdiction ................................................................................. 43
    D.    Corporate Management and Compensation .................................................... 43

ARTICLE XV - RISK FACTORS ............................................................................. 45
    A.    Risk of Non-Payment of Plan Distributions to Holders of Claims and Interests ........ 45
    B.    Certain Bankruptcy-Related Considerations ................................................... 45

ARTICLE XVI - VOTING PROCEDURES ................................................................ 45
    A.    Who May Vote ................................................................................................ 46
    B.    Voting Instructions ......................................................................................... 46
    C.    Deadline for Voting ........................................................................................ 47

ARTICLE XVII- CONCLUSION .............................................................................. 47

# ARTICLE I
# INTRODUCTION

On February 15, 2010, Old Time Pottery, Inc filed its Chapter 11 Plan of Reorganization dated February 15, 2010, and on March 25, 2010, amended and restated the same by filing that certain First Amended and Restated Chapter 11 Plan, etc. (the "Plan") in the United States Bankruptcy Court for the Middle District of Tennessee (the "Court" or the "Bankruptcy Court").

Capitalized terms used in this Disclosure Statement, and not expressly defined in it, are defined in the Plan. A reference in this Disclosure Statement to an "Article" or a "Section" refers to an article or a section of this Disclosure Statement unless specifically indicated otherwise.

This Disclosure Statement describes certain background matters and the material terms of the Plan, but is intended as a summary document only and is qualified in its entirety by reference to the Plan. You should read the Plan to obtain a full understanding of the Plan's provisions. This Disclosure Statement does not constitute financial or legal advice. You should consult your own advisors and/or attorneys if you have questions about the Plan or this Disclosure Statement.

CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE, UNDER WHICH THIS CASE WAS FILED, REQUIRES THAT THERE BE SUBMITTED TO THE HOLDERS OF PREPETITION CLAIMS AND INTERESTS A COPY OF THE DEBTOR'S PLAN OF REORGANIZATION, OR A SUMMARY OF IT, AS WELL AS A WRITTEN DISCLOSURE STATEMENT APPROVED BY THE COURT (AFTER NOTICE AND HEARING) AS CONTAINING INFORMATION ADEQUATE TO ENABLE HOLDERS OF CLAIMS AND INTERESTS TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

BY ORDER ENTERED _____, 2010, THE COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING SUCH ADEQUATE INFORMATION. THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A

RECOMMENDATION BY THE COURT EITHER FOR OR AGAINST CONFIRMATION OF THE PLAN, NOR A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

This Disclosure Statement and the Plan are an integral package. They must be considered together for the reader to be adequately informed.

The information contained in this Disclosure Statement, including the information concerning the Debtor's financial condition and the other information contained herein, is based upon information provided by the Debtor's representatives, or in pleadings or schedules filed in the Case, and has not been subject to an audit or independent review. This Disclosure Statement contains only a summary of the Plan. Each Creditor and Interest Holder is urged to review the Plan prior to voting on it.

The statements contained in this Disclosure Statement are made as of the date of the Disclosure Statement, unless another time is specified. The delivery of this Disclosure Statement shall not under any circumstances create an implication that there has not been any change in the facts set forth since the date of this Disclosure Statement.

Schedules describing the Debtor's assets and liabilities as of the date of the commencement of this Bankruptcy Case are on file with the Clerk of the Bankruptcy Court. They may be viewed electronically at https://ecf.tnmb.uscourts.gov/cgi-bin/login.pl. In addition, counsel for the Debtor have assembled a depository of documents (the "Document Depository") for review, including the schedules of assets, liabilities and executory contracts; statements of financial affairs; monthly operating reports filed by the Debtor; and leases to which the Debtor is a party. Some of the items referenced above will be kept in the Document Depository in electronic form. Any creditor or party desiring to view these documents at the offices of Debtor's counsel should contact Ms. Jody H. Miller, a paralegal in the office of Debtor's counsel, at: (615) 244-4994, or jmiller@gsrm.com.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW. ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTOR, AND/OR INTERESTS IN OR SECURITIES OF THE DEBTOR, SHOULD EVALUATE THIS DISCLOSURE STATEMENT ONLY IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR. YOU SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN UPON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

NO REPRESENTATIONS CONCERNING THE DEBTOR'S PLAN, REORGANIZATION, OR THE VALUE OF THE DEBTOR'S ASSETS ARE MADE OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. YOU SHOULD NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN, THAT ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, IN ARRIVING AT YOUR DECISION AS TO WHETHER TO ACCEPT THE PLAN. ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE

REPORTED IMMEDIATELY TO THE BANKRUPTCY COURT, THE UNITED STATES TRUSTEE OR TO THE UNDERSIGNED COUNSEL FOR THE DEBTOR.

## ARTICLE II
## HISTORY OF THE DEBTOR AND EVENTS LEADING TO CHAPTER 11 FILING

As of August 21, 2009, the date of the filing of the Chapter 11 petition herein, Old Time Pottery, Inc. ("OTP" or the "Debtor") was the owner and operator of thirty-seven (37) home décor retail stores in twelve (12) states throughout the Midwest and Southeast United States, including Alabama, Florida, Georgia, Illinois, Indiana, Kentucky, Missouri, North Carolina, Ohio, Oklahoma, South Carolina and Tennessee. Presently, OTP owns and operates thirty-two (32) stores. OTP is a mass retailer which offers broad ranges of home décor products, generally at deep discounts over other home décor retailers. Inventories at the stores include discounted goods, closeouts, seasonal merchandise and overstocks. The stores are operated pursuant to leases, the majority of which are for large, single-story warehouse-type facilities containing from 57,500 square feet of floor space to 114,000 square feet of floor space.

The company was founded by Mr. Jack H. Peterson in 1985 in Murfreesboro, Tennessee. The Murfreesboro store, opened in June, 1986, remains the corporate headquarters for the company. Mr. Peterson's concept for OTP's corporate operations included four elements: (1) modest corporate offices located in the rear of the Murfreesboro store, (2) efficient distribution of merchandise, (3) economical retail space, and (4) excellent supplier relationships. While the company has obviously expanded, this basic concept has allowed OTP consistently to provide high quality merchandise at prices significantly less than more traditional, high-end retailers.

Inventory at the stores is sourced both domestically and overseas, primarily from China and Taiwan. OTP's product categories include home accents, linens, housewares, glassware, tabletop, wall décor, floral, arts and crafts, outdoor seasonal and holiday seasonal. The company utilizes a

distribution center (located adjacent to the Murfreesboro, Tennessee store), from which merchandise is trucked to the various store locations.

Beginning in 1986, OTP opened one or two stores per year through 1998, at which time management determined to grow faster. From 1999 through 2006, the company opened thirty (30) new stores. Sales reached a plateau in mid-2007, after which sales flattened and then declined fairly dramatically, following the national trend in retail sales activity. Sales during 2008 were approximately 9% less than sales in 2007, and the average value per transaction declined by approximately 1% each. Sales declines meant overstocks of inventory, and efforts to reduce unneeded inventory led to reduced profit margins. In 2008, management implemented inventory-control procedures which remain in effect and operative today.

OTP maintains a depository account in each city in which OTP operates a store. In addition, the company maintains a petty cash fund and a "safe fund" at each store. The company also maintains a regular operating bank account, a credit card account, an accounts payable account, a corporate payroll account and a store payroll account. Each of these accounts is now with Regions Bank in Nashville, Tennessee. Further information concerning the various accounts may be found in the Schedules of Assets filed September 21, 2009 and discussed below.

In the retail industry, OTP's competitors would include Garden Ridge stores (which filed Chapter 11 in 2003), and perhaps others (such as Kohl's, Wal-Mart, Target, Hobby Lobby, Michael's Tuesday Morning and Bed Bath & Beyond) for certain segments of OTP's product offerings. But these national retailers do not provide OTP's broad array of high quality merchandise offered at low discount prices.

Historically, OTP sought retail locations which had formerly been occupied by large retailers, such as K-Mart, Home Depot and Wal-Mart. OTP's strategy has been to lease these locations at low base rental rates pursuant to long-term leases; most leases provide an initial lease term of ten (10)

years and several options to extend the term for five (5) years. A listing of the specific leases with lease terms is included in Schedule G of the Schedules filed with the Court September 21, 2009, discussed below. The retail store in Gulf Shores, Alabama, is owned by OTP Associates Gulf Shores, LP. Some of the owners of OTP Associates Gulf Shores, LP also have an equity interest in OTP. The corporate offices, the Murfreesboro, Tennessee store and the adjacent 160,000 square foot distribution center are leased from OTP Associates Murfreesboro, LP pursuant to a long-term lease set to expire in 2018. Some of the owners of OTP Associates Murfreesboro, LP have an equity interest in OTP. In addition to the lease contracts, the company has routine service contracts at each store location, such as telephone and data service contracts, maintenance contracts, pest control contracts, waste management contracts, security contracts, equipment contracts and billboard leases. The company also has contracted with Fifth Third Processing Services for a merchant credit card processing agreement, in order to monitor and manage the company's credit card transactions with customers.

The company employs approximately 1,600 employees at the store levels, and approximately 50 management personnel at the corporate headquarters. Each store has a store manager, who reports to one of five district managers. Management includes a chief financial officer, a senior marketing manager, a human resources manager, an IT manager, a distribution center manager, a floral production manager and a loss prevention manager. Upper management includes Mr. Scott Peterson, president; Mr. Robert Sharp, chief financial officer; Mr. Bill Hauck, vice president of merchandising; and Mr. W. Fred Williams, part-time executive and director. The company hires a large number of part-time employees, particularly during the holiday season.

As noted above, Jack Peterson's concept for OTP stores was to offer quality merchandise at low prices. The large footprint of the retail facilities offers a setting for the display of merchandise in a warehouse-style layout and the quick turnover of merchandise. The company has specialized in a

constantly changing mix of specialty items, along with a broad stock of standard items. Advertising has played a major role in Mr. Peterson's merchandising strategy over the years. In fact, OTP budgeted approximately $17 million for advertising in 2007 and approximately $15 million for advertising in 2008, with an emphasis on four-page newspaper inserts. The company typically schedules 20-25 "advertising events" per year, with a concentration of the events occurring during the holiday seasons. The company also utilizes billboard advertising, and recently the company has devoted some advertising dollars to television ads.

OTP was founded as a privately-held Tennessee corporation and remains so today. After a long illness, Jack Peterson passed away in May, 2008. Sallie Peterson, the wife of Jack Peterson, and their sons, Scott Peterson and Glenn Peterson, were intermittently active in the operations of OTP from the company's founding in 1985 through 2008. As noted above, Scott Peterson serves as the company's president.

The stock of the company is owned by sixteen (16) different persons or entities, identified specifically in the Statement of Financial Affairs filed in the case on September 21, 2009, and in Article VII hereof. The Jack Hamilton Peterson GST Non-Exempt Marital Trust owns 23.49% of the stock of the company, and this trust is the only shareholder which owns greater than 12% of the stock of the company.

The directors of OTP as of the petition date are: Sallie Peterson of Murfreesboro, Tennessee; Ross Lindsay, III, of Myrtle Beach, South Carolina; Scott Peterson of Murfreesboro; Harry G. Carson, Jr. of Freeport, Pennsylvania; Mr. Richard Lozins of Illinois; and W. Fred Williams of Franklin, Tennessee.

Since 2007, OTP's primary lending arrangement has been a revolving line of credit with SunTrust Bank of Nashville, Tennessee. Amounts owed to SunTrust under the revolving line of credit have fluctuated between approximately $13 million and $37 million. The line of credit has

been renewed by SunTrust on several occasions since 2008. In the summer of 2009, representatives of SunTrust and OTP were negotiating another extension of a forbearance agreement, and OTP anticipated a renewal or an extension without delay. The existing forbearance agreement was set to expire on August 15, 2009, and OTP representatives were traveling to Atlanta, Georgia on August 13 to negotiate the renewal or extension. During the trip, SunTrust unexpectedly advised OTP that the forbearance agreement would not be extended. The parties ultimately agreed that the line would be extended through the week of August 17, 2009 to allow for the payment of OTP's payroll and other crucial expenditures. Facing a termination of its line of credit with SunTrust, OTP filed its voluntary petition under Chapter 11 on Friday evening, August 21, 2009.

SunTrust claims a first-in-priority security interest in all of OTP's assets, including inventory, equipment, cash and accounts. OTP believes SunTrust is fully secured, as the value of SunTrust's collateral far exceeds the indebtedness. Further information concerning the SunTrust indebtedness may be found in Article V below.

## ARTICLE III
## PROGRESS OF THE CHAPTER 11 CASE TO DATE

A.     Initial Activities. With the filing of the Chapter 11 petition, the Debtor also filed several expedited motions (the "First Day Motions"):

1.     An expedited motion for authority to pay prepetition compensation, employee reimbursements and withholding taxes:

2.     An expedited motion for authority to retain existing bank accounts, cash management systems and business forms:

3.     An expedited motion for authority to pay prepetition utility claims, to determine adequacy of assurance payments for utilities, and to establish procedures for requests for adequate assurance payments;

4.      An expedited motion for authority to use cash collateral;

5.      An expedited motion to extend the time for filing schedules and statement of financial affairs;

6.      A declaration under penalty of perjury of Robert Sharp, the chief financial officer of the Debtor; and

7.      An expedited motion to set an emergency hearing on all First Day Motions.

By order entered August 21, 2009 (Docket No. 18), the Court scheduled a hearing on all the First-Day Motions for August 24, 2009. Orders granting each of the First-Day Motions were entered in the days following the August 24, 2009 hearing.

On August 22, 2009, the Debtor filed its application to employ the Nashville law firm of Gullett, Sanford, Robinson & Martin, PLLC, to represent its interests as a debtor-in-possession. By order entered September 16, 2009 (Docket No. 112), that application was granted by the Court.

By notice submitted on August 28, 2009, counsel for the United States Trustee scheduled the Debtors' initial debtor's conference for September 2, 2009, and instructed the Debtor to prepare and produce numerous documents concerning the operations of the Debtor, bank accounts of the Debtor, insurance needs of the Debtor, and anticipated post-petition operations. The Debtor timely produced the documents requested by the United States Trustee, and the initial debtor's conference was conducted as scheduled on September 2, 2009 at OTP's corporate offices in Murfreesboro, Tennessee. Further, and in compliance with the guidelines with the Office of the United States Trustee, the Debtor filed on October 19, 2009, November 16, 2009, December 16, 2009, February 2, 2010 and February 16, 2010 monthly operating reports, detailing results of operations of the Debtor during the post-petition period. The monthly operating reports are available for viewing in the Document Depository.

Pursuant to the Court's order of August 24, 2009 (Docket No. 26), and in accordance with 11 U.S.C. § 521 and Bankruptcy Rule 1007, OTP filed on September 21, 2009 its Schedules of Assets, Liabilities and Executory Contracts and its Statements of Financial Affairs. These detailed Schedules and Statements describe the Debtor's ownership interests; the Debtor's debts owed to secured claim holders, priority claim holders and unsecured claim holders; the equity interests held in the Debtor; and descriptions of the Debtor's ongoing business affairs. The Schedules and Statements have been amended during the case. These Schedules and Statements, and the amendments thereto, are also available for inspection in the Document Depository maintained by counsel for the Debtor. Further information concerning the Debtor's Schedules and Statements may be found in Articles IV and V below.

On September 30, 2009, counsel for the Office of the United States Trustee conducted the Chapter 11 meeting of creditors for the Debtor. Scott Peterson, the Debtor's president, Robert L. Sharp, the Debtor's chief financial officer, and W. Fred Williams, a director of the Debtor, appeared to testify at the meeting of creditors. Such meeting was commenced and concluded on September 30, 2009.

Within the first few weeks of the Chapter 11 case, notices of reclamation were filed by entities which allegedly sold goods or services on credit to the Debtor prepetition. Generally, a right of reclamation exists under the Uniform Commercial Code and is recognized by the United States Bankruptcy Code if certain elements are demonstrated, including the insolvency of the Debtor at the time of delivery of the goods or services. Uniformly, OTP has opposed the allowance of reclamation claims because, among other things, OTP believes it was not insolvent during the prepetition period. Formal objections to the allowance of such reclamation claims were filed by the Debtor and by SunTrust Bank.

As noted above, upon the filing of the Chapter 11 case, OTP requested authority to use the cash generated from the operations of its business to pay expenses such as payroll, utilities and other operating costs, as well to purchase product to sell at its stores. The cash is claimed to be the collateral of SunTrust Bank. Objections to the use of such cash collateral were filed by the Creditors' Committee and certain creditors asserting reclamation and priority claims. SunTrust and OTP have entered into a series of agreed budgets and have submitted to the Court for entry proposed orders that govern OTP's use of SunTrust's cash collateral. Interim orders approving OTP's use of SunTrust's cash collateral have been entered by the Bankruptcy Court under dates of September 4, 2009, September 11, 2009, September 25, 2009, November 16, 2009, November 30, 2009, December 15, 2009, January 19, 2010, February 2, 2010 and March 1, 2010.

B.       Appointment and Activities of Official Committee of Unsecured Creditors. On September 5, 2009, the Office of the United States Trustee filed its Notice of appointment of an Unsecured Creditors' Committee (the "Committee"). Members of the Committee include representatives of OTP's customers and vendors, and are identified as follows:

1. Mr. Jack Ezon, Chair of Committee
   Northpoint Trading, Inc.
   347 Fifth Avenue, Suite 201
   New York, NY  10016
   (917) 257-5040
   jack@nptrd.com

2. Mr. Jackson Kam
   Global Houseware
   Soundwill Plaza, 28th Floor
   38 Russell Street
   Causeway Bay, Hong Kong
   011-852-2-721-3683
   globalhouseware@163.net

3. Mr. Randy Greenberg
   Crystal Art of Florida, Inc.
   3359 East 50th Street
   Vernon, CA  90058
   (323) 581-6617
   randyg@crystarartgallery.com

4. Mr. Greg Bilezikian
   Dennis East International, LLC
   231 Willow Street
   Yarmouth Port, MA  02675
   (508) 375-0009
   gregbilezikian@comcast.net

5. Mr. Ned Hoffman
   Candle-Lite
   10521 Mullington Court
   Cincinnati, OH  45242
   (513) 956-2349

On September 11, 2009, the Committee filed two applications to employ counsel for the Committee. Proposed co-counsel were the Tennessee law firm of Harwell Howard Hyne Gabbert & Manner, P.C. (the "Harwell Firm"), and the New Jersey law firm of Lowenstein Sandler PC ("the Lowenstein Firm"). Objections to the employment of the Lowenstein Firm were filed by the United States Trustee, SunTrust Bank, Gemmy Industries HK Limited, IMG, Inc. and OTP. The Bankruptcy Court conducted a hearing on this contested matter on October 27, 2009. At the conclusion of the hearing, the Court sustained the objections to the Committee's employment of the Lowenstein Firm, and by order entered October 30, 2009 (Docket No. 252), the Lowenstein Firm's employment application was denied. By order entered November 2, 2009 (Docket No. 262), the employment by the Committee of the Harwell Firm was approved, and the Harwell Firm has at all times since been actively serving as such.

On September 30, 2009, the Committee filed its application to employ Traxi, LLC ("Traxi") as a financial consultant to the Committee. A limited objection to this application was filed by the Debtor, but that objection was resolved. The Court entered its order approving the Committee's employment of Traxi by order entered November 4, 2009 (Docket No. 263).

C.      Closure of Certain Stores and Assumption of Leases of Remaining Stores. As of the petition date, OTP was a party (as commercial tenant) to 37 leases of non-residential real property. By October, 2009, OTP had determined the need to close approximately eight (8) of the 37 stores. To that end, OTP filed on November 6, 2009 (Docket No. 281) an expedited application to employ Hudson Capital Partners, LLC ("Hudson Capital") as inventory disposition consultants. This application was expedited in order to allow OTP to conduct store-closing sales during the busy holiday sales season. The Court scheduled an expedited hearing on this application for November 17, 2009, and by order entered November 23, 2009 (Docket No. 344), the application was approved by the Court.

Working with Hudson Capital, OTP prepared for store-closing sales at stores in the following cities:  (a) Fairview Heights, Illinois; (b) Rockford, Illinois; (c) Greensboro, North Carolina; (d) Memphis, Tennessee; (e) Duluth, Georgia; (f) Douglasville, Georgia; (g) Broken Arrow, Oklahoma; and (h) Dayton, Ohio.  Landlords of three of these locations (Fairview Heights, Rockford and Greensboro) subsequently approached OTP, offered concessions, lowered the rent, and suggested other lease modifications favorable to OTP.  With these concessions, OTP has agreed to continue operations at these three locations subject to the terms of the modified leases.  Consequently, store-closing sales have been conducted only at the remaining five locations.

Further, with respect to the five stores at which store-closing sales have been conducted, OTP filed on January 8, 2010 (Docket No. 465) an omnibus motion to reject the commercial leases related to these locations.  By orders entered February 3 and February 9, 2010, OTP's rejection of these five leases was approved.  Store-closing sales at the aforementioned five stores have now been concluded, and proceeds of those sales have been paid over to SunTrust to reduce the SunTrust indebtedness. The amount paid SunTrust from the store-closing sales totals $3,093,493.00.

On November 16, 2009, OTP filed a motion to extend the deadline for it to assume or reject unexpired leases of nonresidential property, in order for OTP to seek post-reorganization financing and evaluate holiday sales results before deciding which leases to assume or reject. The standard 120-day period to assume or reject leases stood to expire on December 20, 2009; OTP's requested extension would push the deadline forward to March 20, 2010. The notice for the motion set the deadline for objections on December 7, 2009, of which there was none. The Court entered its order allowing the extension on December 10, 2009 (Docket No. 386).

On November 16, 2009, OTP also filed a motion to extend the 120-day period within which only OTP may file a proposed Chapter 11 plan of reorganization (Docket No. 314).  By order entered December 10, 2009, this motion was granted (Docket No. 385).

OTP has negotiated modifications with many of the landlords of the remaining thirty-two (32) store locations. OTP has filed motions to assume all thirty-two (32) of the remaining store leases, many as modified. In addition, the Plan contemplates the assumption of those thirty-two (32) leases, which such leases are listed specifically on Exhibit A to the Plan.

OTP's commercial lease of its Orlando, Florida store is set to expire on April 30, 2010, and OTP has determined not to renew the lease. On February 10, 2010, OTP filed with the Court a motion to approve the re-employment of Hudson Capital to facilitate a store-closing sale at the Orlando store, and to approve the sale (Docket No. 651). By order entered February 23, 2010 (Docket No. 719) this motion was granted.

D.      Orders Setting Bar Dates for Claims. On September 23, 2009, OTP filed a motion to establish a bar date and form of notice for claims asserted under 11 U.S.C. § 503(b)(9). OTP filed this motion in order to set up a formal process for administering, allowing, and disallowing the claims under § 503(b)(9) that had already been filed and those that OTP anticipated would be filed in the future. By expedited order of September 24, 2009, the Court set a hearing date on the motion for October 6, 2009. Three vendors objected to OTP's motion. On Oct. 6, 2009, the Court heard arguments and testimony on the motion, and issued an order granting the OTP's motion on October 14, 2009. Per the terms of that order OTP would, within five days, send instructions and a 503(b)(9) claim form to all creditors. Claimants then had until December 7, 2009, the § 503(b)(9) bar date, to submit a claim under § 503(b)(9). In total, creditors submitted 104 claims under § 503(b)(9), with an aggregate dollar amount of $6,605,870.01. Some of the claims are clearly not allowable, for reasons including that they were not filed timely, were not filed with the Bankruptcy Court Clerk as required, or were claims for goods not satisfying the provisions of 11 U.S.C. § 503(b)(9). The Court conducted a pretrial conference on these claims on February 8, 2010.

On October 15, 2009, OTP filed a motion to set bar date deadlines and establish a form of notice for creditors to assert general claims, governmental unit claims, and contract rejection claims. The Court issued an order on October 16, 2009 granting OTP's motion and establishing the bar dates. All general claims were to be filed by November 30, 2009, governmental units were to file claims by February 17, 2010, and contract rejection claims were due by the later of the general bar date of November 30, 2009, or 30 days after the Court entered an order approving the rejection of the contract at issue. The Order instructed OTP to issue to all creditors the general claim form to be used when filing a claim and instructions for participating in the claim process. That procedure has been implemented as directed by the Court.

E. **Sales and Margins Since the Petition Date.** OTP's Chapter 11 petition was filed August 21, 2009. Storewide, sales during the post-petition period (through the week ending January 15, 2010) have averaged approximately $3,870,00.00 per week. This weekly average is slightly higher than weekly sales during the same period in 2008 and early 2009. However, OTP's margins are substantially higher because the company is not having to clear its shelves of outdated, excess inventory. The better margins have made the company more profitable than during the same period last year, and have been instrumental in the increase in cash from approximately $1.7 million in late August, 2009, to approximately $24 million in mid-January, 2010.

OTP is current on payments of its quarterly fees to the United States Trustee. OTP is current on payments to employees, payments of all withholding taxes, rental payments, adequate protection payments to secured creditors and adequate assurance payments to utilities. All post-petition obligations are current. OTP has filed timely all monthly operating reports as contemplated in the guidelines for Chapter 11 debtors established by the United States Trustee. OTP's projections show that OTP will be able to keep all post-petition obligations current through the confirmation of the Plan, through the Effective Date of the Plan, and beyond.

# ARTICLE IV
## ASSETS OF THE DEBTOR

OTP's assets are described below. Since OTP owns no real property, but instead leases the buildings wherein it operates its stores, all items listed represent personal property. OTP's schedules (filed with the Court on September 21, 2009) provide detailed descriptions of the various items of personal property owned by OTP as of August 21, 2009 (the petition date herein), which can be more generally categorized as follows:

| | |
|---|---:|
| Cash on Hand: | $ 211,650.00 |
| Checking and Savings Accounts: | 1,537,555.51 |
| Utility and Lease Security Deposits: | 181,676.10 |
| Accounts Receivable: | 1,220,545.00 |
| Other Contingent and Unliquidated Claims: | 225,281.00 |
| Automobiles: | 105,160.91 |
| Office Equipment and Furniture: | 1,551,743.03 |
| Machinery, Fixtures, Equipment, Leasehold Improvements, Capital Lease: | 5,232,932.29 |
| Inventory, at Cost: | 55,159,014.00 |
| Insurance Claims and Prepaid Insurance: | 371,976.00 |
| Prepaid computer maintenance contracts for equipment and software: | 206,249.00 |
| Total: | $66,003,782.84 |

OTP has included in its Statements of Financial Affairs listings of all payments made by OTP within ninety (90) days before the (August 21, 2009), which total $31,535,174.27. OTP has also listed payments made by OTP to or for the benefit of creditors who are or were "insiders" (as defined in the Bankruptcy Code). In some instances, the pursuit of "avoidance actions" under 11 U.S.C. §§ 544-550 would be of doubtful value to the Debtor's estate. Since it is the OTP's intention to pay

under the Plan all creditors approximately 100% of the allowed amounts of their claims, and since OTP was not balance-sheet insolvent on or before the petition date, the pursuit of such avoidance actions -- and the analysis required to prepare for such avoidance actions -- are not believed to be cost-effective or necessary. The Debtor has attributed no value to potential avoidance actions.

Although the Debtor has no present intention to pursue avoidance or other actions, the Plan provides that upon default in the provision for treatment of Class 6, such actions may be pursued by either the reorganized Debtor or by the Post-Confirmation Committee. In such event the payments made by OTP within the ninety (90) days prior to August 21, 2009 (or in the case of insiders within the two (2) years prior to August 21, 2009, including without limitation, the in-lieu-of-income-tax payments totaling approximately $2.4 million made to certain shareholders in 2008) will be analyzed and pursued to the extent it is determined that any of the payments may be avoidable under chapter 5 of the Bankruptcy Code, including without limitation, actions for recovery pursuant to section 550 of the Bankruptcy Code of transfers avoidable under section 544, 547, 548, 549 or 553(b) of the Bankruptcy Code, or otherwise under applicable state law, including without limitation T.C.A. §66-3-101 et. seq. and the Tennessee Fraudulent Transfer Act at T.C.A. § 66-3-301 et. seq. A list of the payments is detailed in Question 3, including Attachment 3(b) to the Statement of Financial Affairs filed by the Debtor on September 21, 2009 and also includes the in-lieu-of-income-tax payments totaling approximately $2.4 million made to certain shareholders in 2008. Section 546 of the Bankruptcy Code provides a timeframe of two (2) years from the Petition Date, which was August 21, 2009 within which to bring an action to set aside an avoidable preference or fraudulent transfers. The Plan further provides that should the Case be closed prior to payment of the Deferred Portion to Class 6 and subsequently reopened for a default of the Plan, the time period for bringing such action will be tolled or suspended during the time the Case is closed.

The values of assets listed above are as of August 21, 2009. Since the petition date, the primary changes in the value of OTP's assets have been (a) the increase in cash (due primarily to sales during the 2009 holiday season), and (b) the decline in the OTP's inventory. As of mid-February, 2010, cash on hand or in accounts had increased to approximately $22.5 million, and inventory levels were approximately $33.8 million.

## ARTICLE V
## LIABILITIES OF THE DEBTOR

In its Schedule of Liabilities, OTP lists or describes several categories of debts, including secured claims, priority unsecured claims, and general unsecured claims. Detailed descriptions of such claims can be found in the Debtor's Schedules of Liabilities, filed on September 21, 2009. OTP will summarize by category of liability the debts scheduled by OTP.

A.  <u>Secured Claims</u>. Secured claims are held by entities who claim liens against the property of a Debtor as of the petition date. The secured claims have been scheduled as follows:

| Creditor | Amount of Claim |
|---|---|
| Pinnacle National Bank | $ 392,235.00 |
| SunTrust Bank | $ 14,967,186.00 |

Pinnacle National Bank asserts a security interest in telephone and network equipment purchased by OTP with the proceeds of a loan provided by Pinnacle National Bank. SunTrust Bank asserts a security interest in all assets of OTP pursuant to a revolving line of credit in place with SunTrust as of the petition date. The amount of SunTrust's claim (above) does not include outstanding letters of credit of approximately $2 million.

In early March, 2010, subsequent to the store-closing sales at the five stores referenced above, proceeds of the sales were paid over to SunTrust Bank to be applied against SunTrust's allowed secured claim. The total amount of the proceeds paid to the SunTrust is $3,093,493.00.

B.     Priority Claims. The Bankruptcy Code affords holders of certain unsecured claims priority over holders of other unsecured claims. For example, wages, salaries, and commissions of employees, contributions to employee benefits plans, taxes and certain other debts owed to governmental units are all entitled to some degree of priority over other unsecured claims, pursuant to 11 U.S.C. § 507. In this matter, the priority claims listed by OTP in its Schedules are all for taxes owed to various other entities. These claims are presented in detail in the Schedules, but are aggregated here:

| Priority Claims | Total Claim Amount |
|---|---|
| Taxes owed to governmental entities under §507(a)(8) | $    544,402.84 |

In conjunction with the filing of the First-Day Motions on the petition date, OTP filed an expedited motion for authority to pay prepetition compensation, employee reimbursements, and withholding taxes, and an expedited motion for authority to pay prepetition utility claims and required deposits.  Those motions were granted by the Court.  Thus, prepetition wages, salaries, commissions, payroll, and withholding taxes, as well as utility claims and deposits, were paid by OTP in the ordinary course of business.

C.     Administrative Expenses.     A debtor-in-possession under Chapter 11 of the Bankruptcy Code is authorized to operate its business in the ordinary course of business.  Vendors, suppliers, and others that provide goods or services to a debtor post-petition in the regular course of business are entitled to be paid in the regular course of business, and any such claims arising therefrom are entitled to administrative expense priority pursuant to 11 U.S.C. § 503.  OTP has incurred customary and ordinary operating expenses during this Chapter 11 case, such as utilities, purchases of goods and services, payroll and payroll taxes, etc.  As noted above, OTP is current on all trade debts, payroll, payroll taxes, utilities, and OTP has continued to perform in conformity with

budgets provided to the Court.  OTP is current on all quarterly fees payable to the Office of the United States Trustee.  All post-petition payables are current.

As noted above, OTP has employed Gullett, Sanford, Robinson & Martin, PLLC ("GSR&M") of Nashville, Tennessee as its attorneys during the Chapter 11 case.  GSR&M has accrued certain legal fees and expenses during its representation of OTP.  Such fees and expenses, if allowed by the Court, are entitled to administrative expense priority.  As of December 31, 2009, GSR&M incurred legal fees in the amount of approximately $411,937.50 and expenses in the amount of approximately $8,836.72.  GSR&M filed with the Court on January 15, 2010 an application for the allowance and payment of such fees and expenses.  By order entered February 9, 2010 (Docket No. 643), the Court granted the application, and GSR&M has been paid for such fees and expenses incurred through December 31, 2009.  During the month of January, 2010, GSRM incurred additional fees of approximately $96,302.50.  During the month of February, 2010, GSR&M incurred additional fees of approximately $86,506.50.  Additional fees and expenses incurred by GSRM and allowed by the Court will likewise be entitled to administrative expense priority.

Additionally, as noted above, OTP filed an application on November 6, 2009 to employ Hudson Capital as an inventory disposition consultant to facilitate store-closing sales at several of OTP's locations.  Hudson Capital's fees and expenses are likewise entitled to administrative expense priority. As of mid-January, 2010, OTP estimates Hudson Capital's fees and expenses to be approximately $682,000.00.

The Committee's counsel (Harwell Howard Hyne Gabbert & Manner, P.C.) and financial consultant (Traxi, LLC) have been approved as professionals for the Committee, and their fees and expenses are likewise entitled to administrative expense priority.  Fees and expenses incurred by the Committee's counsel through January 31, 2010 are approximately $82,000.00.  Committee's counsel has filed with the Court an application for the allowance and payment of those fees and expenses.  By

order entered March 15, 2010 (Docket No. 807), the Court granted this application. Fees and expenses incurred by the Committee's consultant, Traxi, LLC, are estimated to be approximately $220,000.

OTP has been advised that the Lowenstein Firm may submit to the Court an administrative expense claim under 11 U.S.C. § 503(b)(3)(D), in the amount of approximately $31,000.00. OTP and its counsel have not had an opportunity to review this request, and OTP reserves all rights with respect thereto.

If other professionals are employed by OTP, and such employment is approved by the Court, fees and expenses of those professionals likewise will be entitled to administrative expense priority. Further, it is expected that additional fees and expenses will be incurred by the Committee's professionals up to the effective date of the Plan. If allowed and approved by the Court, such fees and expenses will be entitled to administrative expense priority.

The Debtor contemplates staying current on all post-petition expenses going forward.

D.    <u>General Unsecured Claims</u>.    OTP included on its Schedules certain creditors holding unsecured nonpriority claims against OTP. Approximately 90% of the scheduled unsecured claims consist of claims by entities which sold inventory to OTP on credit prepetition. A portion of these claims may be entitled to administrative expense priority under 11 U.S.C. § 503(b)(9), because goods were received by OTP within twenty (20) days before the petition date. A determination of the precise amount of such priority claims has not yet been made. The Statement of Financial Affairs lists a number of lawsuits against OTP, and OTP disputes any liability as to those lawsuits; further, OTP reserves the right to object to any claims asserted by such claimants. Any such claims are disputed and unliquidated, and have been assigned a zero dollar value in OTP's Schedules.

The total amount of OTP's scheduled unsecured nonpriority claims is:

| Unsecured Claims | Total Claim Amount |
|---|---|
| Inventory, Goods, and Services | $ 23,036,881.17 |

The majority of the $23,036,881.17 figure is composed of inventory, which is reflected in the figures below:

| Unsecured Claims | Claim Amount |
|---|---|
| Inventory Only: | $ 21,406,918.20 |
| Non-Inventory Goods and Services: | $ 1,629,962.97 |

As stated above, some portion of this inventory claim amount may be subject to administrative priority status pursuant to 11 U.S.C. § 503(b)(9), but this amount is unknown at present. The Bankruptcy Court entered an order on October 14, 2009, setting forth a procedure for the administration, allowance and disallowance of these claims. Pursuant to that order, instructions and a "503(b)(9) Request Form" were sent to all creditors. The deadline for any creditor that sold goods to OTP to file a request for allowance of a "§ 503(b)(9) Claim" was December 7, 2009. The total number of such claims is 104, and the total dollar amount of such claims is $6,605,870.01. The Debtor believes that some claims are clearly not allowable, for reasons including that they were not filed with the Bankruptcy Court Clerk as required, were filed after the deadline, or were for goods that were delivered to OTP more than twenty (20) days before the petition date. The remaining claims are either clearly allowable or are subject to dispute and may or may not be allowable. OTP estimates that, at a minimum, claims totaling approximately $2,451,156.09 will be entitled to priority under 11 U.S.C. § 503(b)(9).

## ARTICLE VI
## PREPETITION JUDICIAL PROCEEDINGS

As of the petition date (August 21, 2009), OTP was a named party to fourteen (14) judicial proceedings.  Four of the proceedings were filed as workers compensation actions.  Nine of the proceedings were filed as personal injury actions, wherein plaintiffs assert injuries due to the alleged negligence of employees at various of OTP's store locations.  With respect to these thirteen actions, OTP's insurance carriers are defending the actions on behalf of OTP.  Upon consideration of OTP's insurance coverage, as well as its defenses to these actions, OTP anticipates no material claims arising from these actions.  One proceeding was brought by a landlord claiming OTP failed to repair properly a roof at the landlord's facility previously occupied by OTP.  Additional information concerning each of these actions is described in OTP's Statement of Financial Affairs filed with the Court on September 21, 2009.

## ARTICLE VII
## EQUITY INTERESTS

The following are the holders of the equity interests in OTP, as of the petition date:

| Shareholder | Percentage of Ownership |
| --- | --- |
| The Jack Hamilton GST Non-Exempt Marital Trust | 23.4585% |
| R. Elliot Trust No. 2 | 11.2780% |
| Enigma Trust | 11.2780% |
| M. Tulsa Trust | 11.2781% |
| Irrevocable Trust for Issue of Harry Carson, Sr. | 6.3841% |
| Ross M. Lindsay, III | 5.1546% |
| R. Sam Yarbrough | 1.0309% |
| Scott M. Peterson 2002 Est. Expt. Trust | 4.4072% |
| Scott M. Peterson | 5.5928% |
| Glenn S. Peterson 2002 Est. Expt. Trust | 4.4072% |
| Glenn S. Peterson | 5.5928% |
| Lori A. Peterson 2002 Est. Expt. Trust | 4.4072% |
| Lori A. Peterson | 1.0914% |
| Harry G. Carson, Jr. | 1.5464% |
| Jeffery L. Carson | 1.5464% |
| Pamela A. Carson-Keller | 1.5464% |

## ARTICLE VIII
## SUMMARY OF CHAPTER 11 PLAN OF REORGANIZATION

Under OTP's proposed Chapter 11 Plan, there are seven (7) separate classes of claims and interests. In accordance with 11 U.S.C. § 1123(a)(1), there is no separate class for administrative claims. For a more specific description of the nature of the claims and interests treated under the Plan, please see Articles V and VII above, or the Schedules of Assets and Liabilities and the Statement of Financial Affairs on file with the Court and included in the Document Depository maintained at the offices of OTPs' counsel.

The various classes of claims and interests, and the proposed treatment under the Plan of each such class, are described below. The specific provisions of the Plan control over the provisions of this Disclosure Statement, and the Plan should be consulted for a complete understanding of the treatment of claims and interests. Parties-in-interest should consider consulting legal counsel before voting on whether to accept or reject the Plan.

A.      Class 1 under the Plan includes claims having priority under 11 U.S.C. §507(a)(4) or (5), which generally include priority claims (including wages, salaries, etc.) of employees of the Debtors. On the Effective Date of the Plan, there shall be paid to each Class 1 Claimant cash equal to the allowed amount of its claim. At present, there are no Class 1 claims.

B.      Class 2 under the Plan includes claims having priority under 11 U.S.C §507(a)(8), which generally include priority tax claims. All claims allowed in Class 2 shall bear interest from the Effective Date of the Plan as provided in 28 U.S.C. §§ 6621 and 6622, and shall be paid in equal monthly installments of principal and interest, the first of which installments shall be due on the thirtieth (30th) day after the Effective Date of the Plan and the last of which shall be due on August 21, 2014 (unless the allowed claims and all interest thereon shall have been fully amortized on an earlier date.)

The reorganized Debtor shall timely file each tax return coming due after the Effective Date of the Plan, and shall pay any balance shown to be due thereon at the time the return is filed.

If the reorganized Debtor fails to make any payment required hereunder, any deposit of any currently accruing employment tax liability, or any payment of any tax to the Internal Revenue Service within 10 days of the due date of such deposit or payment, or fails to file any required federal tax return by the due date of such return (as the same may be extended) and pay any outstanding tax liability shown on the return at the time the return is filed, then the United States may declare that the Debtor is in default of the Plan. Failure to declare a default does not constitute a waiver by the United States of the right to declare that the Debtor is in default. If the United States declares the Debtor to be in default of its obligations under the Plan, then the entire liability, together with any unpaid current liabilities, shall become due and payable immediately upon written demand to the Debtor. If full payment is not made within 10 days of such demand, then, notwithstanding the discharge injunction of 11 U.S.C. § 1141(d), the Internal Revenue Service may collect any unpaid liabilities by any means provided by applicable nonbankruptcy law. The Debtor believes the total amount of the Class 2 claims is approximately $544,402.84.

C.      Class 3 under the Plan includes the allowed claims of SunTrust Bank, to the extent such claims are secured by valid, perfected, and unavoidable liens on or security interests in property in which the Estate has an interest, and to the extent of the value, determined in accordance with 11 U.S.C. §506(a), of SunTrust's interests in the Estate's interest in such property. In full settlement, satisfaction and discharge of the claims of the Class 3 Claimant, on the Effective Date of the Plan, the Loan Balance EDOP of SunTrust shall be paid irrevocably in full in cash and each unexpired letter of credit issued by SunTrust for the account of OTP shall be returned to SunTrust or other provision satisfactory to SunTrust shall be made. For purposes of the Plan the term "Loan Balance

EDOP" shall be computed by adding to SunTrust's allowed claim, computed in accordance with the Code as of the Petition Date, interest at the non-default rate specified in the note(s) evidencing such claim, and all other reasonable and allowable fees, costs or charges provided for therein for the period commencing August 21, 2009, and ending on the Effective Date of the Plan, and subtracting therefrom all cash payments made by Debtor to the Class 3 Claimant during said period pursuant to an order relating to the use of cash or adequate protection.

The reorganized Debtor shall join with the Class 3 Claimant in the execution, acknowledgment, delivery and recordation of any documents necessary to give full legal effect to the terms, conditions, and purposes of the Plan. In the event any provision of the Plan is found to conflict with any provision of the notes, loan agreements, security agreements or other documents evidencing the claims of the Class 3 Claimant or the security therefor, the provisions of the Plan shall prevail. Upon compliance of the Debtor with the foregoing, on the Effective Date of the Plan all then existing defaults in or under said notes, loan agreements, security agreements or other documents shall be deemed cured, every purported acceleration of a maturity or due date or exercise of any option based upon any alleged default or event of default shall be deemed annulled and decelerated, and every lien or security interest shall be deemed terminated and discharged.

D.      Class 4 shall consist of the allowed claims of Pinnacle National Bank to the extent such claims are secured by valid, perfected and unavoidable liens or security interests in property with respect to which the Estate has an interest, and to the extent of the value, determined in accordance with 11 U.S.C. § 506(a), of Pinnacle's interest in the Estate's interest in such property. In accordance with 11 U.S.C. § 1124(2), on the Effective Date of the Plan any default in any contractual provision or applicable law that entitles Pinnacle to demand or receive accelerated payment of such claim (other than a default of a kind specified in Section 365(b)(2) of the Code), shall be cured, and the holder of such claim shall be compensated for any damages incurred as a

result of any reasonable reliance by such holder on such contractual provision or such applicable law; the maturity of such claim shall be reinstated as such maturity existed before such default; and the legal, equitable or contractual rights to which such claim entitles the holder thereof shall not otherwise be altered.

E.      Class 5 shall consist of all allowed unsecured claims not entitled to priority and not expressly included in the definition of any other class (including without limitation each such allowed claim arising out of the rejection of any executory contract or unexpired lease, and each such allowed claim secured by a lien on property in which the Debtor had an interest on the Petition Date to the extent that such claim is determined to be unsecured in accordance with 11 U.S.C § 506(a), and each claim of the kinds described in clause (4) or (5) of 11 U.S.C. § 507(a), to the extent that the allowed amount of such claim exceeds the maximum amount or fails to satisfy another condition or limitation (as set forth in said clauses) in or pursuant to which a claim may be accorded priority thereunder), provided, the allowed amount of such claim is not greater than the sum of Five Thousand Dollars ($5,000.00), or the holder of such claim elects to reduce the allowed amount thereof to the sum of Five Thousand Dollars ($5,000.00).   In full settlement, satisfaction and discharge of the claims of the Class 5 Claimants, on the Effective Date of the Plan the reorganized Debtor shall pay to each Class 5 Claimant cash equal to the allowed amount of its claim (as the Claimant may have elected to reduce said amount).

F.      Class 6 shall consist of all allowed unsecured claims not entitled to priority and not expressly included in the definition of any other class (including without limitation each such allowed claim arising out of the rejection of any executory contract or unexpired lease, and each such allowed claim secured by a lien on property in which the Debtor had an interest on the Petition Date to the extent that such claim is determined to be unsecured in accordance with 11 U.S.C § 506(a), and each claim of the kinds described in clause (4) or (5) of 11 U.S.C. § 507(a), to the extent that the allowed amount of such claim exceeds the maximum amount or fails to satisfy another condition or

limitation (as set forth in said clauses) in or pursuant to which a claim may be accorded priority thereunder), provided, the allowed amount of any such claim is greater than the sum of Five Thousand Dollars ($5,000.00), and the holder thereof does not elect to reduce the allowed amount thereof to said sum. In full settlement, satisfaction and discharge of the allowed claims of the Class 6 Claimants, the reorganized Debtor shall remit to each Class 6 Claimant on the Effective Date of the Plan cash equal to seventy-five percent (75%, or 0.75) of the allowed amount of its claim; and, on or before December 25, 2010, the reorganized Debtor shall remit to each Class 6 Claimant, cash equal to twenty-five percent (25%, or 0.25) of the allowed amount of its claim, plus interest on this deferred portion of the claim, computed at three and one-half percent (3.5%), accrued from the Effective Date of the Plan until the date such deferred payment is made.

Until each Class 6 claimant shall have received its Deferred Portion of its allowed claim, plus the interest thereon as provided hereinabove, the following provisions shall be and remain in effect:

1. There shall be a Post-Confirmation Committee comprised of no more than three (3) members, which members shall be selected from the Official Committee of Unsecured Creditors, with the approval of the United States Trustee. The reorganized OTP shall timely provide to the Post-Confirmation Committee copies of all post-confirmation reports filed in the Case and all monthly financial reports provided to the Lender. The Post-Confirmation Committee may retain professionals (including without the necessity of any further order of the Court any professional whose employment by the Official Committee was previously approved in the Case) to assist it in the performance of its duties, the allowed fees of which professionals for providing financial or legal advice in connection with the reorganized OTP's financial performance and ability to pay the Deferred Portion shall be paid by the reorganized OTP in amounts not to exceed $6,000, in the aggregate, for the period from the Effective

Date of the Plan through the due date of the payment of the Deferred Portion, provided however that said cap on fees will not apply if the reorganized OTP is in default of its obligations under the confirmed Plan or its obligations to Lender.

2.  The reorganized OTP shall be prohibited from making any loan, loan repayment, dividend or other distribution or payoff of any kind to any shareholder of OTP, any affiliate of any shareholder, or any relative of any shareholder; provided, however, the foregoing shall not be construed so as to prohibit the payment of (i) compensation or expense reimbursement to any shareholder who is to be employed by the reorganized OTP, as disclosed herein or in the Disclosure Statement; (ii) rent or other amounts coming due under any lease between the Debtor and any affiliate of the Debtor that was assumed under the Plan or otherwise in the Case; or (iii) distributions to shareholders for the purpose of paying their income taxes on any taxable income of OTP that may have been passed through to the shareholders by virtue of OTP's election to be an "S" corporation.

3.  The reorganized OTP shall be prohibited from selling any stock in OTP, or any assets outside the ordinary course of business; provided, however, the foregoing shall not be construed so as to prohibit the conduct of store-closing or similarly-themed sales at certain stores whose leases are expected to expire in 2010, nor the conduct of so-called "yellow tag" events designed to liquidate dated inventory.

Should the reorganized OTP fail to pay when due hereunder the Deferred Portion of the allowed claim of any Class 6 Claimant, and the interest thereon as provided hereinabove, or be in breach of the restrictive covenants that shall be in effect hereunder pending payment of the Deferred Portion, the Plan

shall be in default.  In such event, each Class 6 Claimant and/or the Post-Confirmation Committee shall retain and be entitled to enforce immediately all remedies hereunder, under the Code and Rules, or under other applicable law, on account of such default.  Without limiting the generality of the foregoing,

1.     Any holder of an allowed Class 6 Claim that is in default and/or the Post-Confirmation Committee shall have standing to exercise or seek any other appropriate remedy on account of such default in the Plan, including without limitation to file a motion seeking the reopening of the Case if the Case shall have been closed pursuant to Article X hereof, and, following entry of an order reopening the Case, to exercise or seek any other appropriate remedy on account of such default in the Plan; and

2.     If the Case remains in Chapter 11 and no trustee is appointed in the Case, and the reorganized Debtor refuses or fails, promptly after demand is made, to prosecute any potential avoidance or other cause of action, including without limitation those disclosed in the responses to Item 3 of the Statement of Financial Affairs filed in this Case or that may arise by virtue of the in-lieu-of-income-tax payments totaling approximately $2.4 million, made to certain shareholders in 2008, the Post-Confirmation Committee shall be deemed to be vested with all such causes of action.  The Post-Confirmation Committee may, subject to approval by the Court, employ and compensate such professionals as may be necessary or appropriate to prosecute such causes of action to a final resolution by settlement or judgment. To the fullest extent permitted by law, all applicable statutes of limitation for bringing any such cause of action shall be deemed to have been tolled during any period when the Case was closed.

G.    <u>Class 7</u> shall consist of the interests of the common stockholders of OTP.  The legal, equitable and contractual rights, to which the interests of the Class 7 Interests entitle the holders thereof, are not altered by the Plan.

<b><u>ARTICLE IX</u></b><br><b><u>IMPLEMENTATION OF THE PLAN</u></b>

The principal means necessary for the execution of the Plan include continuation of the Debtor's business, as modified by the closing of certain stores, and the closing of a new revolving line-of-credit facility with FirstMerit Bank , N.A. of Cincinnati, Ohio.  In general, the Debtor, as reorganized, will retain all property of the Estate, excepting property which is to be sold or otherwise disposed of as provided for in the Plan or by prior order of the Court, executory contracts which are rejected pursuant to the Plan or otherwise in the case, and property transferred to creditors of the Debtor pursuant to the express terms hereof.  The retained property shall be used and employed by the Debtor in the continuation of the business.

Without limiting the generality of the foregoing, on the Effective Date of the Plan, the reorganized Debtor shall have closed under a new loan commitment, issued by FirstMerit Bank, for a new revolving line-of-credit facility in the amount of Twenty Million Dollars ($20,000,000.00), including a subfacility for letters of credit of Six Million Dollars ($6,000,000.00), and also including the granting of liens and security interests in favor of the new lender as respects substantially all valuable assets of the Debtor, as is more particularly set forth in the loan commitment.

# ARTICLE X
## LIQUIDATION ANALYSIS

To obtain confirmation of the Plan, the Debtor (as proponent of the Plan) must show that each holder of an impaired class of claims or interests has accepted the Plan, or that each holder will receive or retain under the Plan on account of the holder's claim or interest property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would so receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on said date. Set forth below is the Debtor's best estimate of the results with respect to the secured claims, the priority claims and the general unsecured claims, if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code, on or about the Effective Date of the Plan. For this analysis, OTP is assuming an Effective Date of the Plan to be May 1, 2010.

In a liquidation under Chapter 7, property as to which any secured creditor has a valid, perfected and unavoidable lien or security interest would be abandoned or otherwise made available to the secured creditor for the enforcement of its default remedies. As noted herein, with the exception of telephone equipment purchased shortly before the petition date and financed with Pinnacle National Bank (which was owed approximately $400,000 as of the petition date), SunTrust Bank claims a first-in-priority security interest in essentially all the assets of OTP's estate. The Bankruptcy Code places restrictions on a Chapter 7 trustee with respect to continuing operations of a business in Chapter 7. Without the ability to continue OTP's business operations in Chapter 7 for some significant period, perhaps three to four months, the only avenue open to a Chapter 7 trustee is a true liquidation of the business. This means a cessation of operations, termination of all employees, and a termination of all leases. The leased properties would be surrendered to the landlords with little or nothing realized by the estate therefor.

A true liquidation of the Debtors would, thus, create vast amounts of additional claims that are not presently reflected in the Debtors' schedules. Each of the 37 landlords whose leases would be terminated would have a claim for damages on account of the premature termination of the lease. Further, parties to other contracts (maintenance contracts, service contracts, equipment contracts, all identified in Schedule G of OTP's Schedules filed September 21, 2009) may have claims for damages for termination of those contracts.

Assuming no significant decline in inventory levels, the Debtor's estimate of the results of liquidation of the Debtor's assets, on or about the Effective Date of the Plan (assumed to be June 1, 2010), follows:

| Asset | Estimated Liquidated Value |
|---|---|
| Cash and Accounts: | $ 23,713,195 |
| Inventory (valued at 65.3% of cost): | $ 23,508,000 |
| Deposits: | $ 181,676 |
| Receivables: | $ 900,000 |
| Automobiles: | $ 100,000 |
| Pinnacle's Equipment: | $ 300,000 |
| Other Equipment, machinery, fixtures: | $ 1,500,000 |
| Total Estimated Liquidation Value: | $ 50,202,871 |

SunTrust Bank and Pinnacle Bank are secured creditors, and in a Chapter 7 they would be entitled to be paid from the liquidation of the assets securing their security interests. The Debtor's estimate of the amounts to be paid to these secured creditors in Chapter 7 is:

| | |
|---|---|
| SunTrust Bank (inclusive of letters of credit): | $ 16,044,011 |
| Pinnacle Bank: | $ 350,000 |
| Total Owed to Secured Creditors: | $ 16,394,011 |

After payment of the secured indebtedness, a Chapter 7 trustee would utilize the remaining assets to pay, first, the administrative expenses of the Chapter 7 case (estimated to be at least

$500,000.00), and next, the administrative expenses of the superseded Chapter 11 case (estimated to be at least $1,200,000.00). Holders of other priority claims would next be entitled to be paid. A summary of those estimated claims is as follows:

| | | |
|---|---|---:|
| Chapter 7 Administrative Expenses: | $ | 500,000 |
| Chapter 11 Administrative Expenses: | $ | 1,200,000 |
| §503(b)(9) Claims (if all such claims allowed): | $ | 6,605,870 |
| Priority Tax Claims: | $ | 544,403 |
| Total Priority Claims: | $ | 8,850,273 |

If funds remain after the secured and priority claims, next to be paid in liquidation under Chapter 7 would be general unsecured creditors. OTP estimates that those claims would be approximately $16,431,011.16, plus damages of landlords arising from the termination of OTP's commercial leases. This number (damages of landlords) is very difficult to quantify, but OTP expects that amount to be at least $15-20 million. For purposes of this analysis, OTP has estimated such landlords' claims to total approximately $16,650,000. Other parties to executory contracts may likewise have damages arising from the termination of those contracts (estimated at $500,000).

Thus, assuming the relative accuracy of the amounts stated above, a liquidation analysis under Chapter 7 of the Bankruptcy Code would likely be as follows:

| | | |
|---|---|---:|
| Value of Assets in Liquidation: | $ | 50,202,871 |
| Less Payment to Secured Creditors: | $ | 16,394,011 |
| Less Payment to Priority Creditors: | $ | 8,850,273 |

Funds remaining to pay general unsecured claims, in this scenario, would be only $24,958,587. Yet the total of all general unsecured claims would be at least $33,581,011.

In sum, in a liquidation under Chapter 7 of the Bankruptcy Code, the claims of the secured creditors would likely be paid in full. The priority claims would likely be paid in full. Prepetition

nonpriority, unsecured creditors would likely receive 70-75 cents on the dollar. And, of course, the holders of equity interests in OTP would receive nothing. Consequently, it is clear that the Debtor's Chapter 11 Plan offers creditors and holders of equity interests more than they would receive in a Chapter 7 liquidation, and more than they would receive in any other scenario.

## ARTICLE XI
## ALLOWANCE OF CLAIMS AND TREATMENT OF INTERESTS

Distribution under the Plan will be made only to creditors holding Allowed Claims. No payments will be paid to the holders of disputed claims until the disputed claims become Allowed Claims; however, a distribution may be made on any portion of a disputed claim that is not disputed. When a disputed claim is resolved, to the extent said claim becomes an Allowed Claim, distribution on the allowed portion of the Allowed Claim will be made to the holder of the claim pursuant to the distribution schedule in the Plan. There shall be no distributions or dividends paid to holders of Class 7 Interests (on account of such Class 7 Interests) until all payments required under the Plan to Class 6 Claimants have been made.

## ARTICLE XII
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain federal income tax matters related to the Plan and is provided for informational purposes only. The discussion is based on the Internal Revenue Code of 1986, as amended, applicable proposed, final and temporary Treasury Regulations, judicial authority and current administrative rulings and practice, all of which are subject to change, possibly retroactively.

THIS DISCUSSION IS NOT INTENDED TO BE, AND IS NOT, A COMPLETE DESCRIPTION OF ALL POTENTIAL TAX CONSIDERATIONS THAT MAY BE RELEVANT

TO A DECISION WHETHER TO APPROVE THE PLAN. FOR EXAMPLE, THE DISCUSSION DOES NOT ADDRESS THE FEDERAL INCOME TAX RULES APPLICABLE TO HOLDERS OF INTERESTS OR TO PARTICULAR TYPES OF TAXPAYERS, SUCH AS ESOP'S, FINANCIAL INSTITUTIONS, LIFE INSURANCE COMPANIES, FOREIGN TAXPAYERS, INSIDERS, PARENTS, SUBSIDIARIES OR AFFILIATES OF DEBTORS, NOR DOES IT ADDRESS ANY STATE, LOCAL, OR FOREIGN TAX MATTERS. HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING TAX CONSIDERATIONS RELEVANT TO THE PLAN.

NO RULING FROM THE INTERNAL REVENUE SERVICE HAS BEEN SOUGHT OR OBTAINED IN CONNECTION WITH THE PLAN. IN ADDITION, NO TAX OPINION OF COUNSEL HAS BEEN SOUGHT WITH RESPECT TO ANY OF THE CONSIDERATIONS ADDRESSED HEREIN, AND NO TAX OPINION OF COUNSEL IS GIVEN BY THIS DISCLOSURE STATEMENT.

A.      Certain Federal Income Tax Consequences to Debtors Due to the Impairment of Claims, Etc.    A portion of the Debtor's aggregate outstanding indebtedness may be reduced under the Plan. Generally, cancellation or other discharge of indebtedness triggers income to a debtor equal to the amount (as determined for federal income tax purposes) of the indebtedness forgiven. If debt is discharged in a Chapter 11 bankruptcy case, however, no income to a debtor generally results. Instead, tax attributes otherwise available to a debtor are generally reduced, in most cases by an amount equal to the principal amount of the indebtedness forgiven. Tax attribute reduction applies for purposes of both the regular and alternative minimum tax. Tax attribute reduction is calculated only after the tax for the year of discharge has been determined. Tax attribute reduction is not required with respect to the discharge of a particular debt to the extent that payment of such debt would have given rise to a tax deduction. Additionally, it is possible that there may be certain tax

consequences to the debtor arising out of the sale of its assets, if such sale occurred (which is not expected). Further, the consummation of the Plan may mean a reduction of interest paid by the reorganized Debtor, but there still could be an increase in taxable income.

B. <u>Certain Federal Income Tax Consequences to Holders of Claims</u>. In general, those holders who receive Cash in exchange for their Claims will recognize a gain or loss on the receipt of the Cash. The amount of this gain or loss will be the difference between the amount of cash received and the holder's tax basis in the Claim exchanged therefor. A holder's basis in its Claim will depend on that particular holder's accounting methods and practices, as well as upon the circumstances in which the holder acquired the Claim. If a holder acquired a Claim in exchange for the provision of goods and services, and the holder has already included the amount of the Claim in income for tax purposes, then the holder will generally have a tax basis in the obligation equal to its principal amount. If this is the case, the holder might recognize a loss for tax purposes on such exchange, because the total amount received may be less than the face amount of, and thus the holder's basis in, the claim. If for any reason, a holder has not included the amount of a Claim in income for tax purposes, or if a holder has previously claimed a loss deduction with respect to a Claim, then the holder is likely to recognize a gain on the exchange. The character (capital versus ordinary) of any gain or loss that is recognized by a holder on the exchange will depend on the circumstances under which the holder acquired the Claim exchanged therefore.

To the extent that consideration received by a holder is attributable to accrued interest on the holder's Claim, the consideration so attributable will be deemed made in payment of such interest. The tax laws are unclear on how much consideration shall be attributable to accrued interest when partial payments are made on a debt instrument on which both principal and interest are owed. To the extent that the holder has not yet included the accrued interest in gross income, the cash deemed received in payment of such interest will generally be included in the holder's gross income. To the extent the holder has previously included accrued interest in gross income, the cash deemed received

in payment of such interest generally will not be included in gross income. Moreover, the holder may be able to claim a deductible loss if the Cash deemed received is less than the amount the holder has previously accrued in income.

C.     Importance of Obtaining Professional Tax Assistance.     The foregoing is intended to be only a summary of certain of the federal income tax consequences of the Plan, and is not a substitute for careful tax planning with a tax professional. The federal income tax consequences of the Plan which are discussed herein, and the state, local and foreign tax consequences of the Plan which are not addressed herein, are complex and, in some cases, uncertain. Such consequences may also vary based on the individual circumstances of each holder of a Claim or an Interest. ACCORDINGLY, EACH HOLDER OF A CLAIM OR AN INTEREST IS STRONGLY URGED TO CONSULT WITH SUCH HOLDER'S OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN. In addition to the issues discussed above, issues that a holder may wish to consider include, but are not limited to:

1.     The extent to which the creditor may be entitled to a bad debt deduction or worthless securities loss; and

2.     The extent to which a holder may be entitled to installment sale treatment or other deferral with respect to any distributions it receives subsequent to the Effective Date of the Plan.

**ARTICLE XIII**
**ACCEPTANCE AND CONFIRMATION OF THE PLAN**

The following is a brief summary of the provisions of the Bankruptcy Code respecting acceptance and confirmation of a plan of reorganization. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or consult their own attorneys.

A. **Acceptance of the Plan**. This Disclosure Statement is provided in connection with the solicitation of acceptances of the Plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of Claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the Allowed Claims of that class that have actually voted or are deemed to have voted to accept or reject a plan.

If one or more impaired Classes rejects the Plan, Debtor may, at its discretion, nevertheless seek confirmation of the Plan if the Debtor believes it will be able to meet the requirements of section 1129(b) of the Bankruptcy Code for confirmation of the Plan (which requirements are discussed more fully below) despite lack of acceptance by all impaired Classes. Also, in the event the Bankruptcy Court should determine that the Plan as presently constituted is not confirmable, the Debtor reserves the right to amend the Plan to the extent necessary to obtain entry of the Confirmation Order.

B. **Confirmation**.

1. Confirmation Hearing. Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. Notice of the Confirmation Hearing on the Plan has been provided to all known holders of Claims and interests or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be filed and served as required pursuant to the order approving the Disclosure Statement.

2. Statutory Requirements for Confirmation of the Plan. At the Confirmation Hearing, the Debtor will request that the Bankruptcy Court determine that the Plan satisfies the requirements

of Section 1129 of the Bankruptcy Code. If the Court so determines, the Bankruptcy Court shall enter an order confirming the Plan. The applicable requirements of section 1129 of the Bankruptcy Code are as follows:

a.      The Plan must comply with the applicable provisions of the Bankruptcy Code.

b.      The Debtor must have complied with the applicable provisions of the Bankruptcy Code.

c.      The Plan must have been proposed in good faith and not by any means forbidden by law.

d.      Any payment made or promised by the Debtor under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 case, or in connection with the Plan and incident to the Chapter 11 case, has been disclosed to the Bankruptcy Court and has been approved by or is subject to approval of the Bankruptcy Court as reasonable.

e.      The Debtor must have disclosed the identity and any affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtor or the successor of the Debtor under the Plan. Moreover, the appointment to, or continuance in, such office of such individual, is consistent with the interests of holders of Claims and Equity Interests and the public policy, and the Debtor must have disclosed the identity of any insider of the Debtor or successor of the Debtor under the Plan will employ or retain and the nature of any compensation for such insider.

f.      Best Interests of Creditors Test. Notwithstanding acceptance of the Plan by creditors, the Bankruptcy Court must find, whether or not anyone objects to confirmation, that the Plan is in the "best interests" of creditors. Courts have defined "best interests" as the Bankruptcy Code's requirement that under any plan of reorganization each member of an

impaired Class must receive property with a present value at least equal to the present value of the distribution that each creditor would have received if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

The starting point in determining whether the Plan meets the "best interests" test is a determination of the Chapter 7 liquidation value of the Debtor. The liquidation value of the Debtor has been illustrated in Article X above.

g.      Each Class of Claims has either accepted the Plan or is not impaired under the Plan.

h.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full on the Effective Date and that holders of Priority Tax Claims will be paid, in deferred payments over a period not to exceed six years since the assessment of their Claim, the full value as of the Effective Date of their allowed Claims.

i.      At least one impaired class of Claims must have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

j.      Feasibility. Confirmation of the Plan must not be likely to be followed by the liquidation, or the need for further reorganization of the Debtor or any successor to the Debtor under the Plan.  OTP has prepared an analysis showing anticipated sources and uses of cash, as well as other projections.  Attached as Exhibit A to the Disclosure Statement is the described analysis, showing anticipated sources of cash and payments required under the Plan as noted herein.  OTP believes the Plan to be feasible.

3.      Confirmation Without Acceptance by All Impaired Classes.  Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan, provided that such plan has been

accepted by at least one impaired class. If any impaired classes reject or are deemed to have rejected the Plan, the Debtor reserves its right to seek the application of the statutory requirements set forth in section 1129(b) of the Bankruptcy Code for confirmation of the Plan despite the lack of acceptance by all impaired classes.

Section 1129(b) of the Bankruptcy Code provides that notwithstanding the failure of an impaired class to accept a plan of reorganization, the Plan shall be confirmed, on request of the proponent of the Plan, in a procedure commonly known as "cram-down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under and has not accepted the Plan.

4.      Absolute Priority Rule.  The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the requirement (the "absolute priority rule") that either (a) such class receive or retain under the plan property of a value as of the Effective Date of the Plan equal to the allowed amount of such claim or (b) if the class does not receive such amount, no class junior to the non-voting class will receive a distribution under the Plan.

**ARTICLE XIV**
**EFFECT OF CONFIRMATION**

A.      <u>Injunction</u>.  Except as otherwise provided in the Confirmation Order, confirmation of the Plan and entry of the Confirmation Order shall constitute an injunction against all person or entities from taking any actions (other than actions brought to enforce any right or obligation under the Plan) to commence or continue any action or proceeding that arose before the Confirmation Date against or affecting the Estate, any property of the Estate, the Reorganized Debtor, or any other direct or indirect transferee of any property of Debtor's Estate.

B.      <u>Retention and Enforcement of Claims</u>.  Except as provided in the Plan or in any agreement or release entered into in connection with the Plan, the Reorganized Debtor shall retain

and may enforce any claim, demand, or cause of action as described in the Plan, whether under the Bankruptcy Code, federal or state statute, or common law. However, in the event of a default in the payment of the Deferred Portion of the distributions to the Class 6 Claimants, avoidance actions described in Article VII.3 of the Plan may be vested with the Post-Confirmation Committee, and such committee shall have authority to pursue all such causes of action. The Debtor believes such actions would have no value because, among other things, the Debtor was solvent pre-petition. To the fullest extent permitted by law, all applicable statutes of limitations for bringing any such cause of action shall be deemed to have been tolled during any period when the case was closed.

C. <u>Retention of Jurisdiction</u>. The Bankruptcy Court will retain jurisdiction over all disputes involving the Plan or Claims or Interests in the Chapter 11 Case. The Bankruptcy Court will also retain jurisdiction over any applications for fees and expenses of professionals and any other matter relating to implementation of the Plan.

D. <u>Corporate Management and Compensation</u>. The Board of Directors of Debtor shall set the 2010 annual meeting of the shareholders for a date no later than April 2, 2010. At the annual meeting, the following individuals, who constitute the existing board of directors of the Debtor, shall be elected for terms of one year commencing April 1, 2010, and until their successors shall have been duly elected and shall have assumed their offices:

Harry G. Carson, Jr.

Ross M. Lindsay, III

Richard Lozins

Sallie Peterson

Scott M. Peterson

Fred Williams

Board members will not receive compensation for service on the Board other than reimbursement of expenses. W. Fred Williams, who serves as a part-time executive for the company, shall continue to bill the company hourly for his services. As soon as practicable after the Confirmation of the Plan, the newly elected and constituted Board of Directors of OTP shall hold a special meeting to take the following actions to be effective as of the Effective Date of the Plan:

(a)     to cause the following to be elected as the officers of OTP, such officers to serve until the annual meeting of the Board of Directors in the year 2011:

| Officer | Title | Compensation |
|---------|-------|--------------|
| Scott M. Peterson | President | $200,000 + 0.1 % of sales |
| Gale Inman | Secretary | $49,500 |
| Robert Sharp | Chief Financial Officer/Treasurer | $150,000 |
| Bill Hauck | Vice President of Merchandising | $130,000 |

(b)     to reaffirm the existing provisions of OTP's charter that authorize the issuance of only one class of stock, which is voting, no par, common stock; and

(c)     to cause the charter and by-laws of OTP to be amended or modified in such other respects as may be necessary and sufficient to conform to and to effectuate fully the terms and provisions of the Plan.

So long as the reorganized OTP is not in default of any material term of the Plan, the board of directors reserves the right to grant bonuses, not to exceed $500,000.00, in the aggregate, to employees of the reorganized OTP including the following officers: Robert Sharp; Bill Hauck; and Gale Inman. However, board members will not eligible for bonuses until the Deferred Portion of the Class 6 claim has been paid.

# ARTICLE XV
## RISK FACTORS

A.     <u>Risk of Non-Payment of Plan Distributions to Holders of Claims and Interests</u>.  The primary sources of funding for distributions under the Plan are (1) the successful continuation of the Debtor's business and the continued generation of cash from the operations of the Debtor's stores, and (2) the acquisition of a new lending source to provide a post-confirmation line of credit. Although the Debtor's operations in Chapter 11 have been strong, its financial performance could be adversely affected by, among other factors, a further downturn in the economy.  No absolute assurances can be given as to the payment of distributions called for under the Plan.

B.     <u>Certain Bankruptcy-Related Considerations</u>.  Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for confirmation of the Plan, that such modifications would not adversely affect the holders of Claims or Interests, or that such modifications would not necessitate the resolicitation of votes.

# ARTICLE XVI
## VOTING PROCEDURES

Accompanying this Disclosure Statement are copies of the following documents: (1) the Plan, which is annexed hereto as Exhibit A; (2) the Bankruptcy Court order (a) approving this Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, (b) approving the form of Ballot, and (c) approving the notice of and fixing time for (i) submitting acceptances or rejections to the Plan, (ii) the hearing to consider confirmation of the Plan; and (3) the form of ballot to be executed by holders of impaired claims and Interests for voting to accept or reject the Plan.

A.     Who May Vote.  Under the Bankruptcy Code, impaired classes of claims and equity interests are entitled to vote to accept or reject a plan of reorganization. A class which is not "impaired" is deemed to have accepted a plan of reorganization and does not vote. A class is "impaired" under the Code unless the legal, equitable, and contractual rights of the holders of claims or equity interests in such class are not modified or altered.

If an objection is pending to a Claim or Interest, the holder thereof shall not be eligible to vote on the Plan unless the objection is resolved or, after notice and a hearing pursuant to Bankruptcy Rule 3018(a), the Bankruptcy Court allows the claim or Interest temporarily for the purpose of voting to accept or reject the Plan. Any claimant or Interest holder that wants its Claim or Interest to be allowed temporarily for the purpose of voting must take the steps necessary to arrange an appropriate hearing with the Bankruptcy Court under Bankruptcy Rule 3018(a).

B.     Voting Instructions.  All votes to accept or reject the Plan must be cast by using the form of Ballot enclosed with this Disclosure Statement. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise. After carefully reviewing the Plan and this Disclosure Statement, including the annexed exhibits, please indicate your acceptance or rejection of the Plan on the Ballot and return such Ballot in the enclosed envelope to:

> Jody H. Miller, Paralegal
> Gullett, Sanford, Robinson & Martin, PLLC
> 315 Deaderick Street, Suite 1100
> P.O. Box 198888
> Nashville, TN 37219-8888

If your ballot is damaged or lost, or if you have any questions concerning voting procedures, you may contact Thomas H. Forrester, an attorney for the Debtor, at the address above, or by telephone at (615) 244-4994 or facsimile transmission at (615) 256-6339.  The ballot may NOT be submitted by facsimile, e-mail or other means except by delivery of a completed and signed original.

C.     <u>Deadline for Voting</u>.  BALLOTS MUST BE RECEIVED NO LATER THAN 5:00 P.M. (NASHVILLE TIME) ON _____, 2010 (THE "VOTING DEADLINE"). ANY BALLOT THAT IS NOT EXECUTED BY A DULY AUTHORIZED PERSON SHALL NOT BE COUNTED. ANY BALLOT THAT IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM OR INTEREST BUT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED AN ACCEPTANCE. ANY BALLOT THAT IS FAXED WILL NOT BE COUNTED IN THE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE XVII
## CONCLUSION

THE DEBTOR, WITH THE ASSISTANCE OF ITS PROFESSIONALS, HAVE ANALYZED DIFFERENT SCENARIOS AND BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF ALL PARTIES IN INTEREST AND THAT THE PLAN WILL PROVIDE FOR A GREATER DISTRIBUTION THAN WOULD OTHERWISE RESULT IF AN ALTERNATIVE RESTRUCTURING PLAN WERE PROPOSED OR THE ASSETS OF THE DEBTOR WERE LIQUIDATED UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. IN ADDITION, ANY ALTERNATIVE OTHER THAN CONFIRMATION OF THE PLAN COULD RESULT IN DELAYS AND INCREASED ADMINISTRATIVE EXPENSES RESULTING IN POTENTIALLY SMALLER DISTRIBUTIONS TO HOLDERS OF CLAIMS AND INTERESTS. ACCORDINGLY, THE DEBTOR URGES ALL HOLDERS OF IMPAIRED CLAIMS AND INTERESTS TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY COMPLETING AND RETURNING THEIR BALLOTS SO THEY WILL BE RECEIVED NO LATER THAN THE VOTING DEADLINE.

YOUR VOTE IS IMPORTANT.  PLEASE VOTE PROMPTLY.

Executed this 25th day of March, 2010.

                GULLETT, SANFORD, ROBINSON & MARTIN, PLLC

                By:     /s/ Thomas H. Forrester
                        Thomas H. Forrester
                        G. Rhea Bucy
                        Attorneys for Debtor-in-Possession
                        315 Deaderick Street, Suite 1100
                        P.O. Box 198888
                        Nashville, TN 37219-8888
                        Telephone:  (615) 244-4994
                        Facsimile:  (615) 256-6339
                        tforrester@gsrm.com; rbucy@gsrm.com;
                        bke@gsrm.com


                        **CERTIFICATE OF SERVICE**

        I hereby certify that on March 25, 2010, a true and correct copy of the foregoing document

was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing

system to all parties indicated on the electronic filing receipt.  Parties may access this filing through

the Court's electronic filing system.


                        /s/ Thomas H. Forrester
                        Thomas H. Forrester